MATTHEW W. ROSENE (SBN 294158)
*mrosene@epggblaw.com*
JESSE K. BOLLING (SBN 286267)
*jbolling@epggblaw.com*
**ENENSTEIN PHAM GLASS GUTENPLAN & BOLLING LLP**
3200 Bristol Street, Suite 500
Costa Mesa, CA 92626
Telephone: (714) 292-0262
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

JESSICA MAH, an Individual; ANDREA BARRICA, an Individual; MAHWAY INCEPTION 1, LLC, a Delaware Limited Liability Company; MAHWAY INCEPTION 2, LLC, a Delaware Limited Liability Company; MAHWAY MANAGEMENT, LLC, a Delaware Limited Liability Company; MAHWAY INCEPTION II CLASS B HOLDINGS, LLC; a Delaware Limited Liability Company; and THORTUS LLC, a Delaware Limited Liability Company,

Plaintiffs,

v.

QUINN EMANUEL URQUHART & SULLIVAN, LLP, a California Limited Liability Partnership; ANTHONY ALDEN, an Individual; and ROBERT SCHWARTZ, an Individual,

Defendants.

Case No.: 2:26-cv-09463-ODW-RAO

**FIRST AMENDED COMPLAINT FOR:**

1. **Breach of Fiduciary Duty;**
2. **Legal Malpractice;**
3. **Rescission;**
4. **Common Count for Money Had and Received;**
5. **Fraud;**
6. **Negligent Misrepresentation;**
7. **Violations of Business & Professions Code Section 17200 *et seq.*;**
8. **Civil RICO Violations (18 U.S.C. § 1961 *et seq.*); and**
9. **Conspiracy to Violate Civil RICO (18 U.S.C. § 1962 *et seq.*)**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1. This lawsuit arises from a law firm raking in $2.8 billion per year choosing to abandon its legal and ethical duties to bilk sexual assault victims. The conduct here is both appalling and repugnant. Specifically, Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") and partners Anthony Alden ("Alden") and Robert Schwartz ("Schwartz") deliberately hid the fact that Quinn Emanuel had previously represented Justin Caldbeck—the exact same individual who sexually assaulted plaintiffs Jessica Mah and Andrea Barrica. To make matters worse, Quinn Emanuel had defended Caldbeck **against the same types of claims of sexual abuse that Ms. Mah and Ms. Barrica alleged**.

2. Quinn Emanuel, Alden, and Schwartz made that choice deliberately—even though they knew that they were prohibited from doing so both by the ethical rules governing lawyers and basic human decency. They wanted to enrich themselves, and they did not care that they were not permitted to take on this representation. This fact is demonstrated by their subsequent conduct. Quinn Emanuel, Alden, and Schwartz immediately set about attempting to extract nearly $2 million in fees by improperly overworking matters while also exposing Ms. Mah and Ms. Barrica to serious prejudice in their lawsuits. Their performance not only displayed unconscionable greed—it called into question their loyalty to Ms. Mah and Ms. Barrica over their prior client—the man who sexually abused both women.

3. The rules governing Quinn Emanuel and its lawyers were clear—they were required to inform Ms. Mah and Ms. Barrica fully regarding the conflict and secure their informed consent to the conflict in writing. Rather than follow these clear rules, Quinn Emanuel affirmatively represented that there was no conflict.

4. In fact, Quinn Emanuel deliberately misled Ms. Mah by limiting its disclosure to merely mentioning in passing that Quinn Emanuel had once represented "Mr. Caldwell [sic] several years ago, but the matter seems to be unrelated and

should not pose a problem for this one." In reality, Quinn Emanuel, Alden, and Schwartz decided that it was appropriate to hide the fact that it had represented Ms. Mah and Ms. Barrica's sexual abuser in another case concerning remarkably similar claims of sexual abuse. In other words, Quinn Emanuel put profit before ethical duties to their clients.

5. Quinn Emanuel, Alden, and Schwartz knew that if they disclosed the true nature of the conflict and their prior representation of Caldbeck, then Ms. Mah and Ms. Barrica would have selected other counsel. Losing this matter would mean losing potential revenue—and they decided that the revenue mattered more than their ethical obligations. Accordingly, Quinn Emanuel never asked Ms. Mah or Ms. Barrica to waive the conflict. It never asked Caldbeck, its former client, to waive the conflict. Quinn Emanuel and its attorneys just sat back and allowed the issue to cause harm to their own clients.

6. Quinn Emanuel even instructed Ms. Mah's attorney of record "that [Quinn Emanuel's] role not be disclosed until the mediation" on the pretext "that Quinn Emanuel was recently retained." Revealing this at the mediation could surprise Caldbeck and the Quinn Emanuel name could make Caldbeck see that Ms. Mah meant business. Surreptitiously, it also allowed Quinn Emanuel to hide from Caldbeck, the firm's former client in sexual misconduct cases, that the firm represented Ms. Mah in the case against Caldbeck based on Caldbeck's sexual misconduct. This allowed Quinn Emanuel, Alden, and Schwartz to deliberately and unlawfully run up costs as high as they could as quickly as they could to maximize revenue before the inevitable disqualification.

7. Shortly after Caldbeck learned that Quinn Emanuel was representing Ms. Mah, Caldbeck unsurprisingly demanded in a letter that Quinn Emanuel withdraw as counsel for Ms. Mah and Ms. Barrica. Caldbeck warned that he would move to disqualify Quinn Emanuel if it did not voluntarily withdraw. Notably, even

when faced by Caldbeck's demand, Quinn Emanuel still did not give its clients any analysis of its ethical obligations, the details of the conflict, or the likelihood of its own disqualification. Instead, Quinn Emanuel realized its time on the matter was short and it focused on maximizing fees at the expense of two sexual assault victims.

8. Alden repeatedly told Ms. Mah that Quinn Emanuel's General Counsel was analyzing Caldbeck's disqualification argument, but neither Alden nor anyone else at Quinn Emanuel ever provided analysis to Ms. Mah or Ms. Barrica. In fact, Quinn Emanuel essentially ignored Caldbeck's initial demand to withdraw. Meanwhile, Quinn Emanuel continued to remit extraordinary legal bills for the cases against Caldbeck, knowing full well that neither Ms. Mah nor Ms. Barrica was properly informed of the conflict or that Quinn Emanuel would soon be disqualified.

9. Caldbeck filed motions to disqualify Quinn Emanuel as counsel for Ms. Mah and Ms. Barrica shortly thereafter. Quinn Emanuel did not provide Ms. Mah or Ms. Barrica with any written analysis of these motions or Caldbeck's arguments for disqualifying the firm.

10. Ms. Mah and Ms. Barrica learned about the conflict through Caldbeck's letter and the motions to disqualify Quinn Emanuel. Despite repeated claims that Quinn Emanuel's General Counsel was reviewing the motions to disqualify, no one at Quinn Emanuel gave Ms. Mah or Ms. Barrica any explanation or argument about why Caldbeck was wrong or why Quinn Emanuel was not conflicted and should not be disqualified. As such, Ms. Mah and Ms. Barrica understandably terminated Quinn Emanuel, Alden, and Schwartz as counsel. After all, Quinn Emanuel had not only breached its sacred fiduciary and ethical attorney-client obligations, but it had willingly revictimized both women while chasing the almighty dollar.

11. Rather than accept its mistake along with the $200,000 it had already received from Ms. Mah, Quinn Emanuel demonstrated its true values and demanded *another* $1,700,000. But the legal work was of such little value that a subsequent

non-binding arbitration before a three-arbitrator panel found that "Quinn Emanuel left [Ms.] Mah in a worse position than she was before she retained the firm," "the quality of Quinn Emanuel's work does not justify its rates," its "billing was unconscionable," and on those grounds struck nearly all the fees Quinn Emanuel demanded. Quinn Emanuel rejected that award.

12. Now, Ms. Mah and Ms. Barrica are forced to bring this suit. Having been victimized by Caldbeck, Ms. Mah and Ms. Barrica have now spent more than a year fighting a $2.8 billion legal behemoth that believes that it is not bound by the law or ethical rules governing attorneys. Quinn Emanuel, Alden, and Schwartz apparently believe it is okay to exploit victims to maintain a spot near the top of the Am Law 100 profits per equity partner ranking at more than $8.6 million in profits per equity partner in 2025.

13. This conduct is tortious and entitles Plaintiffs to legal relief that they should never have had to seek.

14. This conduct is also illegal in multiple respects. By violating its ethical duties to clients, Quinn Emanuel's engagement agreements are contrary to public policies, illegal, and unenforceable. Unfortunately, this conduct fits into Quinn Emanuel's established pattern of illegal and conflicted representation for which numerous Courts have chastised and punished Quinn Emanuel. Quinn Emanuel and a parade of attorneys have leveraged these ethical violations into a profitable enterprise extracting millions of dollars from clients through illegal contracts, wire fraud, mail fraud, and transportation of stolen money. This constitutes a pattern of racketeering activity the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1965 *et seq*) was meant to stop.

**THE PARTIES**

15. Plaintiff Jessica Mah is an individual residing in New York, New York.

16. Plaintiff Andrea Barrica is an individual residing in the County of San

Francisco, California.

17. Plaintiff Mahway Inception 1, LLC, is a Delaware limited liability company registered to do business in the State of California with its principal place of business in Los Angeles County.

18. Mahway Inception 2, LLC, is a Delaware limited liability company registered to do business in the State of California with its principal place of business in Los Angeles County.

19. Mahway Inception II Class B Holdings, LLC is a Delaware limited liability company registered to do business in the State of California with its principal place of business in Los Angeles County.

20. Plaintiff Mahway Management, LLC is a Delaware limited liability company registered to do business in the State of California with its principal place of business in Los Angeles County.

21. Plaintiff Thortus LLC is a Delaware limited liability company registered to do business in the State of California with its principal place of business in Los Angeles County.

22. Plaintiffs are informed and believe, and thereon allege, defendant Quinn Emanuel Urquhart & Sullivan, LLP is a California limited liability partnership engaged in the practice of law and doing business as Quinn Emanuel Trial Lawyers that maintains its office and principal place of business at 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017.

23. Plaintiff is informed and believes, and thereon alleges, defendant Anthony Alden is an individual residing in Los Angeles County and an attorney licensed to practice law in California with California State Bar Number 232220 and is a partner in the law firm Quinn Emanuel.

24. Plaintiff is informed and believes, and thereon alleges, defendant Robert Schwartz is an individual residing in Los Angeles County and an attorney licensed to

practice law in California with California State Bar Number 117166 and is a partner in the law firm Quinn Emanuel.

25. In this Complaint, Quinn Emanuel, Alden, and Schwartz are collectively referred to as "Defendants."

26. Plaintiffs are informed and believe, and thereon allege, that Defendants, and each of them, was at all times the agent, employee, co-conspirator, representative or alter ego of each of the remaining Defendants, and that each of the Defendants, committed such acts or omissions within the course and scope of such agency, servitude, employment, conspiracy, representation, or alter ego relationship with the full knowledge, consent, authority, and ratification of each of the other Defendants.

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction over this matter due to the federal questions presented herein, including pursuant to the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1965 *et seq.*).

28. This Court has personal jurisdiction over the Defendants named herein as each performed acts which form the basis of Plaintiffs' claims, in the State or reside or are domiciled in the State.

29. Moreover, as the events giving rise to the claims herein occurred in the judicial district where this Court is situated, and as this District Court is situated in the district in which Defendants (who performed predicate acts identified under 18 U.S.C. § 1961 *et seq*.) all reside or are domiciled, venue is proper. *See* 28 U.S.C. § 1391(b).

30. Finally, this Court has supplemental jurisdiction over all State-based claims set forth herein, as such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy. *See* 28 U.S.C. § 1367. For example, and as set forth in greater detail below, Defendants' wire fraud, mail fraud, and transportation of stolen funds support both

the predicate acts underpinning Plaintiffs' claims for civil RICO and conspiracy to commit civil RICO alleged herein as well as Plaintiffs' State-based claim for breach of fiduciary duty, legal malpractice and negligence, rescission, fraud, negligent misrepresentation, common counts for money had and received, and violations of the California Unfair Competition Law.

31. Similarly, the acts of individual Defendants, who owed fiduciary obligations to Plaintiffs, or who knew of the existence of these fiduciary duties, in perpetuating the RICO enterprise and racketeering activities and conspiring with other Defendants to carry out a fraud on the public, support the claim for violations of civil RICO, as well as Plaintiffs' State-based claims for violations of the California Unfair Competition Law, breach of fiduciary duty, legal malpractice and professional negligence, fraud, negligent misrepresentation, rescission, and common counts for money had and received.

## GENERAL ALLEGATIONS

### A. Justin Caldbeck Invested in One of the Entities Related to Ms. Mah

32. In early 2025, Jess Mah and entities she's involved with had a falling out with an investor, Justin Caldbeck. By that time, Caldbeck was well known in venture capital circles because, in 2017, six women asserted sexual harassment claims against Caldbeck, who then publicly admitted he had abused "his position of power in exchange for sexual gain" and had stepped away from the industry. Ms. Mah's dispute with Caldbeck started after he re-entered the venture capital industry in around 2022.

### B. Caldbeck Sexually Harassed and Assaulted Ms. Mah and Ms. Barrica and then Tried to Extort Them

33. On June 16, 2022, Caldbeck and Ms. Mah attended a business meeting at the restaurant at the Pendry Hotel in West Hollywood, California. During that lunch, Caldbeck consumed several alcoholic drinks. Afterwards, Caldbeck touched

the uppermost part of Ms. Mah's thigh and put his hand next to her genitalia. Ms. Mah told Caldbeck to stop touching her, but she did not report this incident at the time because she was worried about the financial and reputational repercussions she might face.

34. Over the following months, Caldbeck insistently asked Ms. Mah if she was sexually or romantically interested in him. She unequivocally said, "no." Her response did not change when Caldbeck offered to leave his wife and family to be with Ms. Mah.

35. During that same timeframe, Caldbeck routinely made inappropriate sexualized comments to Ms. Mah, including unsolicited and open discussions about his ongoing sexual relationships with other women and sexual acts.

36. In November 2022, Caldbeck and Ms. Barrica attended a business meeting. During that meeting, Caldbeck became heavily intoxicated.

37. After the meeting, Caldbeck and Ms. Barrica summoned an Uber to take them to their separate hotels. Once inside the car, Caldbeck tried to climb on Ms. Barrica and attempted to kiss her. He used his much larger frame and full body weight to force himself onto Ms. Barrica. Ms. Barrica repeatedly protested and had to use her full strength to push Caldbeck away.

38. Ms. Barrica immediately discussed this incident with her friends, but she did not report the incident because she was worried about financial and reputational harm she might face.

39. Within two years after making his investment in Inception 1, Caldbeck demanded that Ms. Mah restructure the company so that he could realize outsized, immediate profits.

40. In early 2025, Ms. Mah advised Caldbeck that she could not restructure Inception 1. Caldbeck did not like this response and he retaliated.

41. First, Caldbeck threatened Ms. Mah. He threatened to tell investors Ms.

Mah had mismanaged the company and threatened to expose unspecified, but supposedly embarrassing, information he claimed to have obtained from Ms. Mah's former employees. He threatened to "destroy" Ms. Mah, stating he was "going to bankrupt" her.

42. Next, Caldbeck created from whole cloth stories about Ms. Mah that he told to investors, the SEC, and other government agencies. Caldbeck invented and shared with other investors patently false allegations that Ms. Mah had "a pattern and history of embezzlement," he publicly accused Ms. Mah of fraud, and he created and spread false rumors that Ms. Mah and Ms. Barrica were in a sexual relationship with each other.

43. As Caldbeck's lies about Ms. Mah, Ms. Barrica and their businesses grew, so did his demands. Eventually, he demanded $2 million to go away—four times his initial investment.

**C. Ms. Mah and Her Entities Tried to Mediate the Dispute with Caldbeck, and Ms. Mah was Referred to Quinn Emanuel**

44. In early 2025, when Ms. Mah and Caldbeck first engaged in mediation discussions and hired JAMS as the neutral, Ms. Mah was working with her attorney Greg Patterson. But Ms. Mah wanted a second opinion.

45. In late March 2025, a business contact named Alex Garden connected Ms. Mah with Anthony Alden, a partner at Quinn Emanuel. More particularly, on March 30, 2025, Alex Garden, acting on behalf of Ms. Mah, contacted Alden at Quinn Emanuel to introduce Ms. Mah and to see whether Quinn Emanuel could help Ms. Mah.

46. That same day, Alden represented to Mr. Garden in an email that Quinn Emanuel, through "two … NorCal partners represented Mr. Caldwell [sic] several years ago, but the matter seems to be unrelated and should not pose a problem for this one."

47. Although Quinn Emanuel and Alden apparently recognized a potential conflict with a former client, neither Alden nor Quinn Emanuel asked Ms. Mah to provide informed written consent despite the significant risk Quinn Emanuel's representation of Plaintiffs would be materially limited by Quinn Emanuel's responsibilities to, or relationship with, its former client Caldbeck.

48. Later that day, Mr. Garden replied to Alden's email and copied Ms. Mah. That reply included Alden's representation about Quinn Emanuel previously representing Caldbeck in a supposedly "unrelated" matter.

49. On information and belief, Alden's March 30, 2025 email was an interstate wire communication sent from Los Angeles that reached Ms. Mah, a New York resident, when Mr. Garden copied her on his reply. The email and reply chain were the first step in inducing Ms. Mah and the Plaintiffs to engage Quinn Emanuel by conveying the "unrelated" representation.

50. Over the next few days, Ms. Mah talked to Alden and another partner at Quinn Emanuel, Robert Schwartz, about the representation, and on April 1, 2025, Ms. Mah executed an Engagement Agreement with Quinn Emanuel ("Original EA"). The Original EA defined the "Engagement" as Quinn Emanuel representing Ms. Mah, "Mahway Inception 1, LLC, and Mahway Management, LLC … in connection with disputes with Justin Caldbeck and D Global Ventures Fund 1 LLP."

51. The Original EA defined the "Scope of Engagement" as the "Engagement, which will include analyzing and conferring on strategy, undertaking factual and legal research, preparing for and attending a mediation, drafting a complaint, and prosecuting and/or defending claims against or by Justin Caldbeck and D Global Ventures Funds 1 LLP."

52. In the Original EA, Quinn Emanuel advised Ms. Mah of conflicts, including, that Quinn Emanuel "previously represented Mr. Caldbeck but believe the subject of that representation to be unrelated to the subject of the Engagement." Yet

again, Quinn Emanuel and Alden recognized a potential conflict with Quinn Emanuel's former client Caldbeck, but neither Alden nor Quinn Emanuel asked Ms. Mah to provide informed written consent. In addition, neither Quinn Emanuel nor Alden advised Ms. Mah that Quinn Emanuel's representation of Caldbeck concerned the same or substantially related matters concerning Caldbeck's pattern of sexual misconduct.

53. Likewise, Quinn Emanuel and Alden failed to inform Ms. Mah of the risk of disqualification or the need to ask Caldbeck to give informed written consent to Quinn Emanuel's representation of Ms. Mah related to claims against Caldbeck based on his sexual misconduct.

54. The Original EA also included an attorneys' fees clause by which the prevailing party in any dispute is entitled to recover its attorneys' fees and costs:

> Notwithstanding anything to the contrary contained in this agreement, the prevailing party in any arbitration, action or proceeding to enforce any provision of this agreement (for avoidance of doubt, a party that obtains a net monetary recovery shall be the prevailing party) will be awarded attorneys' fees and costs incurred in that arbitration, action or proceeding even if the law provides otherwise, including, without limitation, the value of the time spent by QEU&S attorneys to prosecute or defend such arbitration, action or proceeding (calculated at the hourly rate(s) then normally charged by QEU&S to clients which it represents on an hourly basis), except that the foregoing shall not apply to any mediation, as described above, and the parties will split the fees of the arbitrator[.]

55. Ms. Mah paid Quinn Emanuel $200,000.00 as an advanced fee deposit.

56. Ms. Mah paid the $200,000.00 advance fee deposit in reliance on Quinn Emanuel's and Alden's representations that the prior Caldbeck representation was "unrelated" and should not pose a problem, and on the understanding that Quinn Emanuel could validly undertake the Engagement.

57. On April 1, 2025, Quinn Emanuel attorneys started billing Ms. Mah, Mahway Inception 1, and Mahway Management for legal services.

**D. Quinn Emanuel Represented Ms. Mah at Mediation but Sought to Actively Hide that Fact from Caldbeck**

58. On April 18, 2025, Quinn Emanuel provided a draft mediation brief to Ms. Mah and Mr. Patterson, which draft included a footnote discussing Caldbeck's conduct: "Sadly, this is not the first time Mr. Caldbeck has engaged in such misconduct: in 2017, Mr. Caldbeck publicly admitted he had abused 'his position of power in exchange for sexual gain' after reporting revealed six women had accused him of sexual harassment." Of course, Quinn Emanuel knew this fact because it had represented Caldbeck defending against those claims.

59. When Quinn Emanuel finished Ms. Mah's mediation brief, Quinn Emanuel (through one of its attorneys working on behalf of the firm) sent an email to Ms. Mah's attorney of record for the mediation (Gregory Patterson) and copied to Alden and Schwartz with instructions that Quinn Emanuel "was recently retained to assistant [sic] Ms. Mah and Mahway ***and we would ask that their role not be disclosed until the mediation***."

60. On May 9, 2025, Ms. Mah and Caldbeck and their respective counsel participated in mediation in-person but were unsuccessful. They held remote follow-up sessions but were unable to resolve the dispute. Ms. Mah instructed Quinn Emanuel to advise the mediator (and Caldbeck) that Caldbeck should take Ms. Mah's latest offer or Ms. Mah would sue Caldbeck for the sexual abuse she had experienced.

61. Despite post-mediation settlement negotiations, Ms. Mah's dispute with Caldbeck did not settle.

62. Quinn Emanuel accelerated the pace of its legal work, including drafting complaints against Caldbeck, despite the fact that such work repeated early tasks in an effort to increase fees and despite knowing it had failed to disclose a material conflict of interest. By way of example, Quinn Emanuel billed substantial hours after

the mediation to draft a complaint for Ms. Mah against Caldbeck even though they had presented the draft complaint at mediation as leverage.

63. Starting on May 12, 2025, Quinn Emanuel attorneys started billing for legal services specific to Ms. Barrica

**E. Ms. Mah Filed Her Complaint Against Caldbeck**

64. On May 14, 2025, Quinn Emanuel filed a Complaint on behalf of Ms. Mah against Caldbeck, commencing the matter *Mah et al. v. Caldbeck*, Los Angeles Superior Court case No. 25SMCP00264 ("*Mah v. Caldbeck*").

65. The Complaint Quinn Emanuel drafted for Ms. Mah in *Mah v. Caldbeck* included allegations that "Defendant Jason [sic] Caldbeck is a predator. He is a sexual predator. He is a financial predator," that "during a business meeting, [Caldbeck] sexually assaulted Ms. Mah," and referred to Caldbeck as "a serial sexual harasser" based on the allegation that, "[i]n 2017, Mr. Caldbeck publicly admitted that he had abused his 'position of power in exchange for sexual gain,' but only after the press revealed that six women had accused him of sexual harassment. Reporting indicates that Mr. Caldbeck had engaged in similar misconduct during his tenure at Bain Capital and Lightspeed Venture Partners; at Lightspeed, his behavior apparently cost him his job."

66. In *Mah v. Caldbeck*, Ms. Mah asserted a claim against Caldbeck for sexual harassment in violation of California Civil Code § 51.9.

67. On or shortly after May 14, 2025, defendant Alden at Quinn Emanuel mentioned in passing on a phone call with Ms. Mah that Caldbeck might respond to the Complaint with an anti-SLAPP, although he did not explain what that meant or why it could be important.

68. Shortly after the Complaint was served on Caldbeck in the *Mah v. Caldbeck* matter, Quinn Emanuel, on behalf of Ms. Mah, served discovery on Caldbeck.

69. On May 15, 2025, Quinn Emanuel filed a complaint on behalf of Ms. Mah against Walter Delph, commencing the matter *Mah et al. v. Delph*, Los Angeles Superior Court case No. 25SMCV02552 ("*Mah v. Delph*"). In that case, Quinn Emanuel drafted a Complaint that alleges Delph "decided to conspire with Caldbeck, a disgruntled investor and serial sexual harasser … to 'shake down' Ms. Mah for a quick buck" as part of Caldbeck's defamation and extortion campaign against Ms. Mah.

70. In this Complaint, Quinn Emanuel repeated the statement that, "In 2017, Mr. Caldbeck publicly admitted he had abused his 'position of power in exchange for sexual gain' after reporting revealed six women had accused him of sexual harassment."

71. Quinn Emanuel generated its first invoice related to representing Plaintiffs against Caldbeck on or around May 16, 2025, and identified it as "Matter #: 13811-000001."

**F. Quinn Emanuel's Representation Expands to Include Ms. Barrica's Claims Against Caldbeck for Sexual Harassment**

72. On May 19, 2025, Quinn Emanuel and Plaintiffs entered into a revised Engagement Agreement ("Revised EA") that expanded to include Quinn Emanuel representing Ms. Barrica in her complaint against Caldbeck for sexual harassment and related claims and representing a variety of business entities related to Ms. Mah.

73. The Revised EA defined the "Engagement" as Quinn Emanuel representing Ms. Mah; "Mahway Inception 1, LLC; Mahway Management, LLC; Mahway Inception 2, LLC; Mahway Inception II Class B Holdings, LLC; Mahway Investment Group, LLC; Mahway Consulting LLC; Mah Family IDF; and Thortus LLC … and Andrea Barrica in connection with the disputes with Justin Caldbeck, D Global Ventures Fund 1 LLP, Walter Delph, William Mulholland and Travis Saville."

74. The Revised EA defined the "Scope of Engagement" as the "Engagement, which will include analyzing and conferring on strategy, undertaking factual and legal research, preparing for and attending a mediation, drafting a complaint, and prosecuting and/or defending claims against or by Justin Caldbeck, D Global Ventures Funds 1 LLP, Walter Delph, William Mulholland, and Travis Saville."

75. The Revised EA included the same "conflict" disclosure that Quinn Emanuel "previously represented Mr. Caldbeck but believe the subject of that representation to be unrelated to the subject of the Engagement."

76. Like the Original EA, the Revised EA included an attorneys' fees clause by which the prevailing party in any dispute is entitled to recover its attorneys' fees and costs:

> Notwithstanding anything to the contrary contained in this agreement, the prevailing party in any arbitration, action or proceeding to enforce any provision of this agreement (for avoidance of doubt, a party that obtains a net monetary recovery shall be the prevailing party) will be awarded attorneys' fees and costs incurred in that arbitration, action or proceeding even if the law provides otherwise, including, without limitation, the value of the time spent by QEU&S attorneys to prosecute or defend such arbitration, action or proceeding (calculated at the hourly rate(s) then normally charged by QEU&S to clients which it represents on an hourly basis), except that the foregoing shall not apply to any mediation, as described above, and the parties will split the fees of the arbitrator[.]

77. Although Quinn Emanuel and Alden again recognized a potential conflict with Quinn Emanuel's former client Caldbeck, neither Alden nor Quinn Emanuel asked any of the Plaintiffs to provide informed written consent.

78. In addition, neither Quinn Emanuel nor Alden advised any of the Plaintiffs that Quinn Emanuel's representation of Caldbeck concerned the same or substantially related matters concerning Caldbeck's pattern of sexual misconduct.

79. Neither Quinn Emanuel nor anyone acting on its behalf asked Plaintiffs to sign a waiver of conflict.

80. Neither Quinn Emanuel nor anyone acting on its behalf advised that Quinn Emanuel or Alden had asked or would ask Caldbeck to give informed written consent to Quinn Emanuel's representation of Plaintiffs related to claims against Caldbeck related to his sexual misconduct.

81. On May 20, 2025—one day after the Revised EA—Quinn Emanuel filed a Complaint on behalf of Ms. Barrica against Caldbeck, commencing the matter *Barrica et al. v. Caldbeck*, Los Angeles Superior Court case No. 25STCV14801 ("*Barrica v. Caldbeck*"). Quinn Emanuel drafted and filed the *Barrica v. Caldbeck* Complaint, which detailed Ms. Barrica's sexual harassment claims against Caldbeck, including a sexual assault in a ride-share after a business meeting.

82. In *Barrica v. Caldbeck*, Ms. Barrica asserted a claim against Caldbeck for sexual harassment in violation of California Civil Code § 51.9.

83. Before Quinn Emanuel sent Plaintiffs the Revised EA for review and signature, it had already billed over fifty hours for drafting and revising Ms. Barrica's complaint against Caldbeck.

84. On May 20, 2025, Quinn Emanuel filed a Complaint on behalf of Ms. Mah against William Mulholland, commencing the matter *Mah et al. v. Mulholland*, Los Angeles Superior Court case No. 25SMCV14815 ("*Mah v. Mulholland*"). In that case, Quinn Emanuel drafted a Complaint that alleges Mulholland "decided to conspire with Justin Caldbeck—a disgruntled investor and serial sexual harasser— … to 'shake down' Ms. Mah for a quick buck" as part of Caldbeck's defamation and extortion campaign against Ms. Mah.

### G. Quinn Emanuel Charged Plaintiffs for "SEC Advice" Under a Different Client Number

85. In mid-May 2025, Quinn Emanuel started billing Plaintiffs for work it

labeled as "SEC Advice," but for which the invoices stated was "in connection with disputes with Justin Caldbeck and D Global Ventures Fund 1 LLP."

86. Quinn Emanuel never provided Plaintiffs with a separate engagement agreement specific to SEC advice, nor did the Original EA or Revised EA mention any work related to the SEC. Nonetheless, starting on or around May 19, 2025, Quinn Emanuel started billing Plaintiffs for "SEC Advice" under a different matter number, "Matter #: 13811-000001A," and generating separate invoices for this work.

**H. Quinn Emanuel's Conflict Regarding Caldbeck Moves to the Forefront**

87. On June 4, 2025, Caldbeck's attorneys in the *Mah v. Caldbeck* matter sent a letter to Quinn Emanuel advising that Quinn Emanuel had a conflict of interest representing Ms. Mah and Ms. Barrica in the *Mah v. Caldbeck*, *Barrica v. Caldbeck*, *Mah v. Mulholland*, and *Mah v. Delph* matters ("Conflict Letter"). In the Conflict Letter, Caldbeck's counsel highlighted that Quinn Emanuel had previously represented Caldbeck in sexual harassment cases, including "disputes from 2017" that "feature prominently in both complaints"—*i.e.*, the *Mah v. Caldbeck* matter and the *Barrica v. Caldbeck* matter. In the Conflict Letter, Caldbeck's counsel also pointed out that the complaints in *Mah v. Delph* and *Mah v. Mulholland* featured the 2017 allegations against Caldbeck.

88. Quinn Emanuel provided the Conflict Letter to Ms. Mah and Plaintiffs, but neither Quinn Emanuel nor any of its attorneys advised Plaintiffs about the potential repercussions of Quinn Emanuel's conflict of interest based on Quinn Emanuel previously representing Caldbeck related to the sexual harassment claims from 2017.

89. Likewise, Quinn Emanuel did not advise Ms. Mah or Plaintiffs to seek an independent legal opinion about the Conflict Letter or the issues raised in it.

90. Instead, Alden and Schwartz chose to abuse the trust placed in them by

Ms. Mah and Plaintiffs. Alden and Schwartz told Ms. Mah over the phone that Quinn Emanuel's attorneys were reviewing the potential conflict issues, but that Plaintiffs did not need to worry about Quinn Emanuel being disqualified as counsel for Ms. Mah or any of the Plaintiffs.

**I. Quinn Emanuel Warns Ms. Mah of "Sticker Shock" for the Invoice She Was About to Receive**

91. On June 13, 2025, Ms. Mah participated in a call with Schwartz of Quinn Emanuel. During this call, Schwartz advised Ms. Mah that she was going to have "sticker shock" at Quinn Emanuel's invoice for May 2025. She did.

92. Quinn Emanuel emailed Ms. Mah an invoice for $632,610.09 for Quinn Emanuel's work in May 2025. After receiving that invoice, Ms. Mah talked to her attorneys at Quinn Emanuel on June 19, 2025, to discuss the obscene amount of Quinn Emanuel's fees.

93. On information and belief, the $632,610.09 invoice was transmitted from Los Angeles to Ms. Mah by interstate wire. The invoice implicitly represented that the billed fees were properly incurred and owed under a valid engagement, despite the known conflict and the absence of informed written consent.

94. On June 23, 2025, Quinn Emanuel sent to Ms. Mah for the first time an Attorneys' Fees and Costs Estimate for Quinn Emanuel's expected cost to litigate the dispute. Quinn Emanuel estimated that it would cost between $3,436,987 and $3,980,073 to litigate the dispute, incurred at $250,000 to $300,000 per month.

95. Ms. Mah told Quinn Emanuel, "we need to slow our roll right now and just let the jets cool across the board. We don't push harder on the discovery or reach out more right now to just let everything sink in."

96. Ms. Mah followed up with another email summarizing, "my goal still remains to settle this out so we can put it behind us and move on with our lives. As much as I want to take this all the way, and as much as we need to posture in that

direction, I don't want to spend millions of dollars and I don't want to have this drag on for years if we can figure out an offramp sooner. That's why I think once it's clear that Caldbeck's case lives in arbitration, it's a good time for us to start discussing a settlement again."

97. Regardless, starting in June 2025, Quinn Emanuel staffed attorneys based in its Washington, D.C., New York, and Zurich, Switzerland offices on Plaintiffs' case, including associate attorney Kristin Casey in the Washington, D.C. office; partner Sarah H. Concannon in Washington, D.C. and New York offices; associate attorney Ariane Machavoine in the Zurich office; counsel Pierre-Yves Marro in the Zurich office; partner Simon Vorburger in the Zurich office; and partner Kurt Wolfe in the Washington, D.C. office.

**J. Quinn Emanuel's Conflict Regarding Caldbeck Moves Back into the Spotlight**

98. On June 26, 2025, Caldbeck filed a Motion to Disqualify Quinn Emanuel as counsel for Ms. Mah in *Mah v. Caldbeck* and a Motion to Disqualify Quinn Emanuel as counsel for Ms. Barrica in *Barrica v. Caldbeck*.

99. Like in the June 4, 2025 Conflict Letter, Caldbeck detailed that Quinn Emanuel represented him related to allegations of sexual harassment asserted against him in 2017, and that the 2017 allegations were the basis in Ms. Mah's and Ms. Barrica's Complaints that Caldbeck is a "serial sexual harasser."

100. According to Caldbeck's Motion to Disqualify, Caldbeck hired Quinn Emanuel and Dianne Doolittle, a partner in Quinn Emanuel's Silicon Valley office, to represent him in 2017 to defend him against allegations of sexual harassment by limited partners in two venture funds and "Caldbeck spent significant time with Quinn Emanuel on the matter, working with them on media strategy, communications with accusers, communications with the limited partners, and defense of the arbitrations that stemmed from the accusations." Per Caldbeck, "Caldbeck's work

with [Quinn Emanuel] revolved around these allegations of sexual harassment."

101. In his Motion to Disqualify, Caldbeck pointed out that the Complaint in *Mah v. Caldbeck* "relies heavily on allegations of 'a pattern of behavior' with respect to alleged sexual harassment throughout. … The discovery served by [Ms. Mah] in this action also seek evidence regarding past allegations, including documents that would presumably be in [Quinn Emanuel]'s possession."

102. Caldbeck's Motion to Disqualify also pointed out that the discovery Quinn Emanuel served on behalf of Ms. Barrica in the *Barrica v. Caldbeck* case sought discovery asking Caldbeck "to identify all persons who have ever made a complaint of sexual misconduct against him," "to describe the substance of each complaint," and "to describe all communications with five past accusers," which accusers and complaints "prompted Caldbeck to approach and hire Quinn Emanuel in 2017."

103. Caldbeck argued that Quinn Emanuel violated the Rules of Professional Conduct and the "duties of loyalty and of confidentiality" Quinn Emanuel owes to Caldbeck "preclude [Quinn Emanuel] from representing" Ms. Mah, Ms. Barrica, and the entities associated with them.

104. Quinn Emanuel sent the motions to Ms. Mah and told her that Caldbeck had scheduled the hearings four months out, but Quinn Emanuel did not provide substantive analysis of Caldbeck's arguments at that time or ever.

105. Indeed, Quinn Emanuel never provided any written guidance or analysis to Plaintiffs addressing Caldbeck's claims that Quinn Emanuel was conflicted, Caldbeck's demands that Quinn Emanuel withdraw as counsel for Plaintiffs, or Caldbeck's argument that Quinn Emanuel would be disqualified as counsel for Plaintiffs.

106. Instead, on June 26, 2025, Alden advised Ms. Mah that Quinn Emanuel's "general counsel is analyzing." Plaintiffs are informed and believe, and

thereon allege, that Quinn Emanuel's general counsel at that time was Harry A. Olivar, Jr. Regardless, on June 28, 2025, Alden told Ms. Mah that despite Caldbeck's Motion to Disqualify in the *Mah v. Caldbeck* and *Barrica v. Caldbeck* matters, "everything should proceed as if the motions had not been filed."

**K. Plaintiffs Sought an Independent Review of the Conflict Issue**

107. On June 27, 2025, Ms. Mah advised attorneys at Quinn Emanuel that Mr. Patterson was getting involved again.

108. Ms. Mah and Ms. Barrica sought independent review of the Conflict Letter and Caldbeck's Motion to Disqualify Quinn Emanuel in the *Mah v. Caldbeck* and *Barrica v. Caldbeck* cases. But Quinn Emanuel still failed to provide any substantive response or argument related to Caldbeck's Conflict Letter and his Motions to Disqualify and Quinn Emanuel did not try to convince Plaintiffs that they did not have a conflict of interest or that Caldbeck was wrong on any of the facts or arguments presented in the letter or motions.

109. On July 12, 2025, Quinn Emanuel advised Ms. Mah: "Not surprisingly, Caldbeck has filed anti-SLAPP motions against your complaints. … Let us know if you'd like us to review and offer our thoughts." But this was a surprise to Ms. Mah. Indeed, this was the first time anyone at Quinn Emanuel sent anything to Ms. Mah in writing about anti-SLAPP and its potential application to the complaints Ms. Mah and Ms. Barrica filed against Caldbeck.

110. As July 2025 wore on, Ms. Mah and Ms. Barrica continued to ask Quinn Emanuel lawyers about the conflict issues Caldbeck raised in his letter and motions, but they never received a substantive response. Instead, Quinn Emanuel lawyers deflected and claimed general counsel was looking into it.

111. At the end of July 2025, Quinn Emanuel still had not provided a substantive response regarding the Caldbeck conflicts and Ms. Mah advised Quinn Emanuel that the case would be transferred back to Mr. Patterson. Starting on or

around July 22, 2025, Alden started emailing Ms. Mah and Mr. Patterson regarding Mr. Patterson substituting as counsel.

112. Regardless, Quinn Emanuel continued to invoice under two separate matter numbers, with Quinn Emanuel's September 9, 2025 invoice in the Caldbeck matter showing Quinn Emanuel continued to bill Ms. Mah through August 25, 2025.

113. On September 15, 2025, Quinn Emanuel sent a letter to Plaintiffs in which Quinn Emanuel claimed Plaintiffs owed Quinn Emanuel $1,707,181.96 and demanded payment in full.

114. That September 15, 2025 demand from Quinn Emanuel was the balance left after Quinn Emanuel applied the $200,000.00 advance fee deposit Ms. Mah made months earlier.

115. Ms. Mah advised that Plaintiffs was not going to pay Quinn Emanuel the $1,707,181.96 the firm demanded, and Quinn Emanuel forced the issue into fee arbitration with the Los Angeles County Bar Association's Mandatory Fee Arbitration program. Plaintiffs incurred approximately $75,975 with new counsel in the mandatory fee arbitration.

116. With new counsel, Ms. Barrica still lost the anti-SLAPP claim as to her extortion claim against Caldbeck in the *Barrica v. Caldbeck* matter. Ms. Barrica was found liable for $27,000 of Caldbeck's legal fees related to his anti-SLAPP motion against the Complaint Quinn Emanuel drafted and filed.

117. With new counsel, Ms. Mah was forced to litigate the issues raised in Caldbeck's anti-SLAPP in the *Mah v. Caldbeck* matter. Plaintiffs, including Ms. Mah and Ms. Barrica, incurred approximately $211,804.00 litigating against the anti-SLAPP motions and related fee requests filed by Caldbeck in *Mah v. Caldbeck* and *Barrica v. Caldbeck*, which cases were both based on complaints Quinn Emanuel drafted and filed in those cases.

### L. Quinn Emanuel and the Enterprise Knowingly Engaged in Conflicted Representation in Violation of the Rules of Ethics by Which the Enterprise Established a Pattern of Racketeering

118. Plaintiffs are informed and believe, and thereon allege, that Quinn Emanuel, Alden, Schwartz, Casey, Concannon, Machavoine, Marro, Vorburger, Wolfe, Olivar, Christopher Tayback, Diane Doolittle, Hope Skibitsky, Renita Sharma, Corey Worcester, and Adam Wolfson (collectively, the "Enterprise") acted in concert for the benefit of one another and the Enterprise.

119. Plaintiffs are informed and believe, and thereon allege, that Quinn Emanuel and the individual members of the Enterprise, through unauthorized transfers, transferred from accounts in California to accounts in New York, Washington, D.C., and Zurich, Switzerland, some or all of the $200,000.00 advance fee deposit Ms. Mah paid to Quinn Emanuel.

120. Plaintiffs are informed and believe, and thereon allege, that Quinn Emanuel and each of the members of the Enterprise are not entitled to any of the $200,000.00 deposit because their conflicted representation of Plaintiffs renders the Original EA and Revised EA illegal and void. Thus, Plaintiffs are informed and believe, and thereon allege, that Quinn Emanuel was obligated to return the $200,000.00 fee deposit to Ms. Mah but has failed and refused to do so and thus has stolen money belonging to Ms. Mah.

121. Plaintiffs are informed and believe, and thereon allege, that the Enterprise, including Quinn Emanuel, Alden, Schwartz, Doolittle, Olivar, Tayback, Casey, Concannon, Machavoine, Pierre-Yves Marro, Vorburger, and Wolfe intentionally represent clients in matters in which they are conflicted from representation under the applicable ethics rules, including under the California Rules of Professional Conduct without obtaining, or even attempting to obtain, the required informed written consent of the clients and former clients.

122. Plaintiffs are informed and believe, and thereon allege, that the Enterprise, including Quinn Emanuel, Alden, Schwartz, Doolittle, Olivar, and Tayback knew that Quinn Emanuel was conflicted from representing Ms. Mah, Mahway Inception 1, LLC and Mahway Management LLC at the time the Original EA was executed based on Quinn Emanuel's prior representation of Caldbeck regarding his pattern of sexual harassment and sexual impropriety.

123. Plaintiffs are informed and believe, and thereon allege, that the Enterprise, including Quinn Emanuel, Alden, Schwartz, Doolittle, Olivar, and Tayback knew that Quinn Emanuel was conflicted from representing Plaintiffs at the time the Revised EA was executed based on Quinn Emanuel's prior representation of Caldbeck regarding his pattern of sexual harassment and sexual impropriety.

124. Plaintiffs are informed and believe, and thereon allege, that Quinn Emanuel repeatedly and consistently engages in conflicted representation despite the express prohibitions against this practice and despite those members of the Enterprise, including Quinn Emanuel, Alden, Schwartz, Doolittle, Olivar, and Tayback knew Quinn Emanuel was conflicted from representation.

125. Quinn Emanuel and Alden twisted themselves further into a conflicted knot after Plaintiffs fired Quinn Emanuel, Alden, and Schwartz. More specifically, plaintiffs are informed and believe, and thereon allege, that Quinn Emanuel failed to notify Plaintiffs that Quinn Emanuel and Alden were representing one of Plaintiffs' former business partners in a dispute against Plaintiffs. But they did not obtain—let alone request—written consent from Plaintiffs. Indeed, Plaintiffs are informed and believe, and thereon allege, that Quinn Emanuel and Alden took affirmative steps to hide this representation from Plaintiffs.

***Quinn Emanuel and the Enterprise Knowingly Represented a Client Against its Former Client, Uber Technologies, Inc., in a Substantially Related Matter***

126. Plaintiffs are informed and believe, and thereon allege, that the Enterprise, including Quinn Emanuel, Olivar, and Tayback knew that Quinn Emanuel was conflicted from representing claims against Uber Technologies, Inc. after the firm had defended Uber Technologies, Inc. in sixteen to twenty unfair-competition cases from 2012–2016.

127. Plaintiffs are informed and believe, and on that basis allege, that Quinn Emanuel represented SC Innovations, Inc. in an antitrust/unfair-competition suit against Uber Technologies, Inc. in the matter *SC Innovations, Inc. v. Uber Technologies, Inc.,* 434 F. Supp. 3d 782 (No. 3:18-cv-07440-JCS) in the U.S. District Court, N.D. Cal. ("*SCI v. Uber*").

128. Plaintiffs are informed and believe, and thereon allege, that in *SCI v. Uber*, Uber moved to disqualify Quinn Emanuel on the grounds that *SCI v. Uber* was substantially related to Quinn Emanuel's prior representation of Uber in unfair competition cases which exposed the firm to Uber's confidential information.

129. Plaintiffs are informed and believe, and thereon allege, that the Court in the Northern District of California in *SCI v. Uber* granted the motion to disqualify Quinn Emanuel based on a conflict arising from prior representation.

130. Plaintiffs are informed and believe, and thereon allege, that the court's ruling disqualifying Quinn Emanuel in *SCI v. Uber* rendered Quinn Emanuel's engagement agreement with SCI illegal and unenforceable.

***Quinn Emanuel and the Enterprise Knowingly Represented a Client Against its Former Client, Bright Data Ltd., in a Substantially Related Matter***

131. Plaintiffs are informed and believe, and thereon allege, that the

Enterprise, including Quinn Emanuel, Skibitsky, Sharma, Worcester, Wolfson, Olivar, and Tayback knew that Quinn Emanuel was conflicted from representing claims against Bright Data Ltd. after the firm had represented Bright Data Ltd. in early 2023 defending its data-scraping business model conduct.

132. Plaintiffs are informed and believe, and thereon allege, that Quinn Emanuel represented X Corp. in a lawsuit against Bright Data Ltd. over data-scraping conduct in *X Corp. v. Bright Data Ltd.*, No. 3:23-cv-03698-WHA, U.S. District Court, N.D. Cal. ("*X v. Bright Data*").

133. Plaintiffs are informed and believe, and thereon allege, that in *X v. Bright Data*, Bright Data moved to disqualify Quinn Emanuel on the grounds that *X v. Bright Data* involved data-scraping conduct that was substantially related to the data-scraping conduct for which Quinn Emanuel represented Bright Data in prior proceedings, including through Quinn Emanuel attorneys Skibitsky, Sharma, Worcester, and Wolfson, among others.

134. Plaintiffs are informed and believe, and thereon allege, that the Court in *X v. Bright Data* (Judge Alsup), granted the motion to disqualify Quinn Emanuel for breaching its duty of loyalty based on the conflicted representation of a former client.

135. Plaintiffs are informed and believe, and thereon allege, that the court's ruling disqualifying Quinn Emanuel in *X v. Bright Data* rendered Quinn Emanuel's engagement agreement with X Corp. illegal and unenforceable.

***Quinn Emanuel and the Enterprise Knowingly Represented a Client Against its Current Client, CoStar Group, Inc., in Another Pending Matter***

136. Plaintiffs are informed and believe, and thereon allege, that the Enterprise, including Quinn Emanuel, Olivar, and Tayback knew that Quinn Emanuel was conflicted from representing claims against CoStar Group, Inc. while the firm also represented CoStar Group, Inc. in a separate employment case.

137. Plaintiffs are informed and believe, and thereon allege, that Quinn Emanuel represented CoStar Group, Inc. in an employment case in the United States District Court for the Northern District of California (*i.e.*, *Kutagula v. Matterport/CoStar*), while simultaneously representing Commercial Real Estate Exchange, Inc. (CREXi) in *CoStar Group, Inc. v. Commercial Real Estate Exchange, Inc. (CREXi)*, U.S. District Court, C.D. Cal. Case No. 2:20-cv-08819 ("*CoStar v. CREXi*").

138. Plaintiffs are informed and believe, and thereon allege, that in *CoStar v. CREXi*, CoStar moved to disqualify Quinn Emanuel as counsel for CREXi on the grounds that Quinn Emanuel simultaneously represented CoStar in *Kutagula v. Matterport/CoStar*, which made Quinn Emanuel adverse to CoStar without CoStar's informed consent.

139. Plaintiffs are informed and believe, and thereon allege, that the Court in *CoStar v. CREXi*, Judge Consuelo B. Marshall, granted CoStar's motion to disqualify Quinn Emanuel for being adverse CoStar—a current client of Quinn Emanuel—in another matter.

140. Plaintiffs are informed and believe, and thereon allege, that the court's ruling disqualifying Quinn Emanuel in *CoStar v. CREXi* rendered Quinn Emanuel's engagement agreement with CREXi illegal and unenforceable.

***Quinn Emanuel and the Enterprise Knowingly Represented a Client Against its Former Client, Joe Kiani, in a Substantially Related Matter***

141. Plaintiffs are informed and believe, and thereon allege, that the Enterprise, including Quinn Emanuel, Olivar, and Tayback knew that Quinn Emanuel was conflicted from representing claims against Joe Kiani (a founder of Masimo) while the firm had previously represented Kiani.

142. Plaintiffs are informed and believe, and thereon allege, that Quinn

Emanuel represented members of the Board of Directors of Masimo against its founder in *Kiani v. Koffey et al.*, Orange County Superior Court Case No. 30-2025-01484637 ("*Kiani v. Koffey*").

143. Plaintiffs are informed and believe, and thereon allege, that Mr. Kiani moved to disqualify Quinn Emanuel as counsel for the Masimo board of directors on the grounds Quinn Emanuel previously represented Mr. Kiani related to his position with Masimo.

144. Plaintiffs are informed and believe, and thereon allege, that the Court in *Kiani v. Koffey*, Judge Thomas J. Lo found Quinn Emanuel's "side-switching" violated the Rules of Professional Conduct and granted the motion to disqualify Quinn Emanuel.

145. Plaintiffs are informed and believe, and thereon allege, that the court's ruling disqualifying Quinn Emanuel in *Kiani v. Koffey* rendered Quinn Emanuel's engagement agreement with the Masimo board illegal and unenforceable.

***The Enterprise Continues to Defraud Clients Through the Scheme by which Quinn Emanuel Fraudulently Represents Clients Although it is Conflicted from Doing So***

146. Plaintiffs are informed and believe, and thereon allege, that the Enterprise's scheme is ongoing and is currently being litigated in the United States District Courts for the Northern District of California and the Western District of Texas.

147. Plaintiffs are informed and believe, and thereon allege, that in the matter *Edmundson v. Pagaya Technologies Ltd.*, United States District Court for the Northern District of California Case No. 3:25-cv-06029, defendant Pagaya Technologies Ltd. filed a motion to disqualify Quinn Emanuel as counsel for plaintiff Edmundson because Quinn Emanuel advised Pagaya Technologies Ltd. on non-compete and non-solicitation provisions for its employees, including Edmundson, but

is now representing Edmundson in his lawsuit over his termination from Pagaya Technologies Ltd. Plaintiffs are informed and believe that Pagaya Technologies Ltd. claims this creates a direct and incurable conflict for Quinn Emanuel. Plaintiffs are informed and believe, and thereon allege, the motion has been briefed but the Court has not yet entered an order.

148. Plaintiffs are informed and believe, and thereon allege, that in the matter *Techtronic Industries Co. v. Muddy Waters Capital LLC*, United States District Court for the Western District of Texas Case No. 1:25-cv-00249, defendant Muddy Waters Capital LLC moved to disqualify Quinn Emanuel on the grounds the firm represented Muddy Waters Capital LLC and its founder and affiliates during short-seller investigations by the Department of Justice and Securities Exchange Commission and then began representing plaintiff Techtronic Industries Co. in a substantially related libel suit against Muddy Waters Capital LLC. Plaintiffs are informed and believe, and thereon allege, the motion has been briefed but the Court has not yet entered an order.

**M. Defendants' Racketeering Scheme**

***1. The Scheme to Defraud***

149. Plaintiffs are informed and believe, and thereon allege, that the Enterprise operated a scheme to obtain and retain fee-generating engagements by misrepresenting and concealing known disqualifying client conflicts, then maximizing fees before the conflicts caused disqualification.

150. The scheme included representing that Quinn Emanuel's prior representation of Caldbeck was "unrelated" while, on information and belief, concealing that Quinn Emanuel and Doolittle had represented Caldbeck in 2017 on the same sexual-harassment allegations that the firm made central to the complaints and discovery for Ms. Mah and Ms. Barrica.

151. Alden's March 30, 2025 email, the Original EA, and the Revised EA repeated or conveyed the "unrelated" representation, even though the conflict

disclosure itself showed that Quinn Emanuel knew of its former-client relationship with Caldbeck.

152. The Enterprise did not seek informed written consent from Ms. Mah, Ms. Barrica, or the other Plaintiffs, and, on information and belief, did not seek informed written consent from Caldbeck, before undertaking or expanding the representation.

153. The Enterprise also concealed the representation from Caldbeck by directing that Quinn Emanuel's role "not be disclosed until the mediation" on the pretext that it "was recently retained," thereby delaying discovery of the conflict and disqualification while the firm continued to work and bill.

154. After the mediation, Quinn Emanuel performed duplicative complaint work, including substantial hours drafting a complaint that had already been presented as mediation leverage, to increase fees despite knowing it had failed to disclose a material conflict.

155. Before the Revised EA was sent for review and signature, Quinn Emanuel had already billed over fifty hours drafting and revising Ms. Barrica's complaint and then expanded the engagement to include her claims and additional entities.

156. The Enterprise separately billed "SEC Advice" under Matter #: 13811-000001A even though no separate engagement agreement covered that work and neither the Original EA nor the Revised EA mentioned SEC work.

157. After Ms. Mah instructed Quinn Emanuel to "slow our roll" and not push discovery or outreach, Quinn Emanuel staffed the matter with attorneys in its Washington, D.C., New York, and Zurich, Switzerland offices.

158. Quinn Emanuel then generated nearly $2 million in fees in less than four months, warned of an expected litigation cost of $3,436,987 to $3,980,073 at $250,000 to $300,000 per month, and continued billing under two matter numbers.

159. When Caldbeck raised the conflict, Alden and Schwartz told Ms. Mah not to worry about disqualification; Alden said the "general counsel is analyzing," later said "everything should proceed as if the motions had not been filed," and Quinn Emanuel lawyers continued to deflect by saying general counsel was looking into it.

160. Regardless, the attorneys continued to bill Plaintiffs. The Enterprise retained the $200,000 advance fee deposit, applied it against the demand, and then demanded $1,707,181.96 after Plaintiffs terminated the representation and the fee-arbitration panel found that Quinn Emanuel left Ms. Mah in a worse position, that the quality of its work did not justify its rates, and that its billing was unconscionable.

161. The Enterprise's motive was to obtain revenue before the inevitable disqualification and to maintain the billing as long as possible, rather than to protect Plaintiffs' interests.

162. The Enterprise acted with knowledge and intent to defraud. Among other things, Quinn Emanuel and Doolittle had represented Caldbeck in 2017 regarding the same sexual-harassment allegations; the draft mediation brief relied on those 2017 allegations; and the repeated conflict disclosures demonstrated awareness of the former-client relationship while omitting its material nature.

163. The misrepresentations and concealments induced Plaintiffs to enter and expand the engagements, pay the deposit, accept legal work, and incur the losses alleged below.

### *2. The RICO Enterprise*

164. The association-in-fact Enterprise is the group identified above, in Section L, as Quinn Emanuel, Alden, Schwartz, Casey, Concannon, Machavoine, Marro, Vorburger, Wolfe, Olivar, Tayback, Doolittle, Skibitsky, Sharma, Worcester, and Wolfson.

165. The Enterprise had the common purpose of generating fees from engagements the members knew were conflicted while concealing those conflicts

from current and former clients.

166. The Enterprise had an ongoing organization and decision-making structure beyond the predicate acts, including partners directing engagements, a general-counsel function used to review and deflect conflict issues, Quinn Emanuel's matter-numbering and invoicing system, multi-office staffing across Los Angeles, Silicon Valley and Northern California, Washington, D.C., New York, and Zurich, and accounts receiving transferred funds.

167. The partners and lawyers functioned through that structure to decide whether to accept and expand engagements, how to disclose conflicts, how to staff and bill matters, and how to respond to disqualification demands.

168. The Enterprise functioned as a continuing unit through multiple iterations, including those identified in *SCI v. Uber*, *X v. Bright Data*, *CoStar v. CREXi*, *Kiani v. Koffey*, Plaintiffs' matters, the post-termination representation of a former business partner, and the currently pending *Edmundson v. Pagaya* and *Techtronic v. Muddy Waters* disqualification motions.

169. The non-defendant members are included to establish the relationships and distinctness of each of the Defendants as a RICO person from the Enterprise, and their roles are alleged only as described in the existing factual allegations.

170. In the alternative, Quinn Emanuel is a legal-entity enterprise, and Alden and Schwartz are RICO persons distinct from that enterprise who conducted its affairs through the racketeering activity alleged below.

171. The Enterprise engaged in and affected interstate and foreign commerce through interstate communications, multi-state and international staffing, and transfers of the advance fee deposit to New York, Washington, D.C., and Zurich, Switzerland.

***3. Predicate Acts***

172. The following predicate acts are pleaded with particularity. Where the

existing allegations do not state the mode or location of transmission, Plaintiffs allege on information and belief that the communication or invoice was sent by interstate wire, mail, or both, based on Ms. Mah's residence in New York, Quinn Emanuel, Alden, and Schwartz's Los Angeles location, the pleaded email transmissions, the multi-office staffing, and the transfers to New York, Washington, D.C., and Zurich.

173. Predicate Act 1: On March 30, 2025, Alden, acting in Los Angeles for Quinn Emanuel, emailed Mr. Garden that "two … NorCal partners represented Mr. Caldwell [sic] several years ago, but the matter seems to be unrelated and should not pose a problem for this one." Mr. Garden replied the same day and copied Ms. Mah, a New York resident. This interstate wire communication was false or misleading because Quinn Emanuel's 2017 Caldbeck representation concerned the same sexual-harassment allegations, and the communication was intended to induce the engagement and furthered the scheme. This act violated 18 U.S.C. section 1343.

174. Predicate Act 2: On April 1, 2025, Quinn Emanuel, through Alden in Los Angeles, transmitted the Original EA to Ms. Mah in New York, on information and belief by interstate email, containing the representation that Quinn Emanuel "previously represented Mr. Caldbeck but believe the subject of that representation to be unrelated to the subject of the Engagement," without requesting informed written consent. The representation was false or misleading because the prior Caldbeck representation concerned the same sexual-harassment allegations, and the Original EA furthered the scheme by securing the engagement. This act violated 18 U.S.C. section 1343 or section 1341.

175. Predicate Act 3: In April 2025, a Quinn Emanuel attorney emailed Patterson, copying Alden and Schwartz, and asked that the firm's role "not be disclosed until the mediation" on the pretext that Quinn Emanuel "was recently retained," in the context of the April 18 draft mediation brief. This interstate wire was misleading because it concealed the conflicted representation from Caldbeck while

the firm knew its prior representation concerned the allegations at issue, and it furthered the scheme by delaying disqualification and preserving the fee-generating engagement. This act violated 18 U.S.C. section 1343.

176. Predicate Act 4: On or around May 16, 2025, Quinn Emanuel generated and transmitted its first invoice, identified as Matter #: 13811-000001. On information and belief, it was sent by mail or interstate wire from Los Angeles to Plaintiffs. The invoice implicitly represented that the fees were properly incurred and owed under a valid engagement, although Quinn Emanuel knew of the disqualifying conflict and the absence of informed written consent, and it furthered the scheme by seeking payment under an unlawful contract. This act violated 18 U.S.C. section 1341 or § 1343.

177. Predicate Act 5: On May 19, 2025, Quinn Emanuel, through Alden in Los Angeles, transmitted the Revised EA to Plaintiffs, including Ms. Mah in New York, on information and belief by interstate email, repeating that Quinn Emanuel "previously represented Mr. Caldbeck but believe the subject of that representation to be unrelated to the subject of the Engagement." The statement was false or misleading for the same reason as the Original EA statement, and the Revised EA furthered the scheme by expanding the engagement to Ms. Barrica and additional entities without informed written consent. This act violated 18 U.S.C. section 1343 or section 1341.

178. Predicate Act 6: On or around May 19, 2025, Quinn Emanuel generated separate "SEC Advice" invoices under Matter #: 13811-000001A. On information and belief, those invoices were sent by mail or interstate wire from Los Angeles to Plaintiffs. They implicitly represented that the fees were properly incurred and owed under a valid engagement even though no separate engagement covered SEC advice and the known conflict remained undisclosed, and they furthered the scheme by seeking additional fees under an unlawful contract. These acts violated 18 U.S.C.

section 1341 or § 1343.

179. Predicate Act 7: After the June 4, 2025 Conflict Letter, Alden and Schwartz spoke with Ms. Mah by telephone and told her that Plaintiffs did not need to worry about Quinn Emanuel being disqualified. On information and belief, the calls were interstate wires from Los Angeles to Ms. Mah in New York. The assurances were misleading because they omitted the known conflict and the risk of disqualification, and they furthered the scheme by maintaining the representation and billing under an unlawful contract. These acts violated 18 U.S.C. section 1343.

180. Predicate Act 8: On June 13, 2025, Schwartz spoke with Ms. Mah and warned that she would experience "sticker shock" at the May invoice. The call was an interstate wire from Los Angeles to Ms. Mah in New York, on information and belief. In context, the communication was misleading because it disclosed the magnitude of the charge while omitting that the fees were allegedly incurred under a known conflict and an unlawful contract, and it furthered the scheme by preserving the billing relationship. This act violated 18 U.S.C. section 1343.

181. Predicate Act 9: Quinn Emanuel emailed Ms. Mah an invoice for $632,610.09 for work performed in May 2025. On information and belief, it was transmitted by interstate wire from Los Angeles to New York. The invoice implicitly represented that the fees were properly incurred and owed under a valid engagement, although Quinn Emanuel knew of the conflict and had not obtained informed written consent, and it furthered the scheme by demanding payment under an unlawful contract. This act violated 18 U.S.C. section 1343 or section 1341.

182. Predicate Act 10: On June 23, 2025, Quinn Emanuel sent Ms. Mah an Attorneys' Fees and Costs Estimate projecting $3,436,987 to $3,980,073 in litigation costs at $250,000 to $300,000 per month. On information and belief, the estimate was sent by interstate wire from Los Angeles to New York. It implicitly represented that the projected fees would be properly incurred and owed under a valid engagement,

while omitting the known conflict and disqualification risk, and it furthered the scheme by setting expectations for continued fee extraction under an unlawful contract. This act violated 18 U.S.C. section 1341 or section 1343.

183. Predicate Act 11: On June 26, 2025, Alden told Ms. Mah that Quinn Emanuel's "general counsel is analyzing," and on June 28, 2025, Alden told her that "everything should proceed as if the motions had not been filed." On information and belief, those communications were interstate wires from Los Angeles to Ms. Mah in New York. They were misleading because they deferred a substantive conflict analysis while implying that continued work and billing were proper, and they furthered the scheme by preserving the engagement under an unlawful contract despite the pending disqualification motions. These acts violated 18 U.S.C. section 1343.

184. Predicate Act 12: During July 2025, Quinn Emanuel lawyers communicated with Ms. Mah and Ms. Barrica about the conflict issues and deflected by claiming that general counsel was looking into them. On information and belief, the communications were sent by interstate wire from Los Angeles to Plaintiffs. They were misleading because they continued to withhold substantive conflict analysis while Quinn Emanuel continued to invoice under an unlawful contract, and they furthered the scheme by delaying the end of the fee-generating relationship. These acts violated 18 U.S.C. section 1341 or section 1343.

185. Predicate Act 13: On September 9, 2025, Quinn Emanuel transmitted an invoice showing that it continued billing Ms. Mah through August 25, 2025, under two matter numbers. On information and belief, the invoice was sent by mail or interstate wire from Los Angeles to Plaintiffs. It implicitly represented that the fees were properly incurred and owed under valid engagements despite the known conflict and pending disqualification issues, and it furthered the scheme by seeking payment under an unlawful contract. This act violated 18 U.S.C. section 1341 or section 1343.

186. Predicate Act 14: On September 15, 2025, Quinn Emanuel sent Plaintiffs a letter demanding $1,707,181.96. On information and belief, the demand was transmitted by mail or interstate wire from Los Angeles to Plaintiffs. It falsely or misleadingly represented that Plaintiffs owed the amount for fees incurred under valid engagements, although the engagements were conflicted and the deposit had already been applied, and it furthered the scheme by attempting to obtain additional money under an unlawful contract. This act violated 18 U.S.C. section 1341 or section 1343.

187. Predicate Act 15: Quinn Emanuel and members of the Enterprise transferred some or all of the $200,000 advance fee deposit from California accounts to accounts in New York, Washington, D.C., and Zurich, Switzerland. On information and belief, the transfers were interstate and foreign wires. The funds were obtained and retained through the misleading conflicted representations and the unlawful Original EA and Revised EA, and the transfers furthered the scheme by moving or receiving proceeds of the fraud. This conduct constituted wire fraud under 18 U.S.C. section 1343 and transportation or receipt of money of at least $5,000 known to have been taken by fraud under 18 U.S.C. sections 2314–2315.

***4. Pattern of Racketeering Activity***

188. The predicate acts are related because they share the same purpose of obtaining and retaining fees through concealed conflicts and misleading representations, produce the same result of extracting money under unlawful contracts and invalid engagements, involve the same Enterprise participants and intended victims, and use the same methods of concealment, interstate communications, invoicing, and transfers.

189. The pattern has closed-ended continuity because it includes at least fifteen predicate acts from March 30, 2025, through at least September 15, 2025, continuing through the Enterprise’s retention of the deposit and Quinn Emanuel’s

rejection of the fee-arbitration award.

190. The pattern also has open-ended continuity because these acts are the Enterprise's regular way of doing business, as shown by the *SCI v. Uber*, *X v. Bright Data*, *CoStar v. CREXi*, and *Kiani v. Koffey* matters, in which, on information and belief, the Enterprise invoiced clients by interstate wire under engagement agreements rendered illegal by conflicts; the Introduction's allegation that the Enterprise extracted millions through illegal contracts, wire fraud, mail fraud, and transportation of stolen money; the concealed post-termination representation of Plaintiffs' former business partner; the two currently pending disqualification motions in *Edmundson v. Pagaya* and *Techtronic v. Muddy Waters*; and the continuing refusal to return the deposit.

### *5. Each of the Defendants Participated in the Conduct of the Enterprise's Affairs*

191. Quinn Emanuel operated and managed the Enterprise's affairs by adopting the conflicted-intake and concealment practices, issuing invoices under two matter numbers, staffing Plaintiffs' matters with attorneys from multiple offices, receiving and transferring the $200,000 deposit, and sending the September 15 demand.

192. Alden operated and managed the Enterprise's affairs by soliciting the engagement, authoring the March 30 misrepresentation, executing or transmitting the conflict statements in the Original EA and Revised EA, controlling client communications about disqualification, and directing that matters "proceed" despite the motions.

193. Schwartz operated and managed the Enterprise's affairs by participating in intake calls, receiving and acquiescing in the instruction to conceal Quinn Emanuel's role until mediation, giving assurances after the Conflict Letter, making the "sticker shock" call, and supervising or participating in the billing process.

194. Doolittle's 2017 representation of Caldbeck, Olivar's role as the general counsel purportedly analyzing the conflict, and the other members' knowledge and staffing roles are alleged only as described in Sections L and M. These roles, together with the agency, co-conspirator, and acted-in-concert allegations, show the Enterprise's organization and the Defendants' distinct participation in its affairs.

195. Each Defendant's conduct involved operation or management of the Enterprise's affairs, not merely the provision of routine services, because each directed, adopted, or implemented the intake, concealment, staffing, billing, or collection practices that advanced the Enterprise's common purpose.

***6. Injury and Causation***

196. Plaintiffs suffered concrete injury to their business or property by reason of the Enterprise's racketeering activity. Plaintiffs seek only financial losses for this claim, not damages for personal injury.

197. The financial injury is at least $514,779.00, consisting of the $200,000.00 advance fee deposit, the $27,000 fee award against Ms. Barrica, $211,804.00 in anti-SLAPP litigation costs, and $75,975 in fee-arbitration costs.

198. Plaintiffs were the direct and intended targets of the scheme. But for the misrepresentations and concealment, Plaintiffs would have retained other counsel, as alleged in the Introduction, and would not have paid the deposit or continued under the conflicted engagements.

199. The $200,000.00 deposit was paid in reliance on the misleading conflict representations, was transferred among the Enterprise's accounts, and was not returned even after the engagements were terminated.

200. The anti-SLAPP exposure arose from the complaints Quinn Emanuel drafted and filed under the fraudulently obtained engagements, including the $27,000 fee award against Ms. Barrica and the $211,804.00 incurred litigating the anti-SLAPP motions and related fee requests.

201. The $75,975 in fee-arbitration costs arose from Plaintiffs' compelled response to Quinn Emanuel's fraudulent $1,707,181.96 demand. The arbitration panel's findings that Quinn Emanuel left Ms. Mah in a worse position, that its work did not justify its rates, and that its billing was unconscionable further support the direct relation between the scheme and Plaintiffs' financial injury.

***7. Conspiracy to Violate RICO***

202. Quinn Emanuel, Alden, and Schwartz each knowingly agreed to conduct and participate in the conduct of the Enterprise's affairs through the pattern of racketeering activity, and/or agreed to the commission of at least two predicate acts, in violation of 18 U.S.C. § 1962(d).

203. Each Defendant was aware of the essential nature and scope of the Enterprise and knowingly adopted the goal of furthering it: obtaining and retaining fees through concealed conflicts, misleading communications, inflated or unauthorized billing, and collection of money under allegedly invalid engagements.

204. The agreement may be inferred from the Defendants' words, actions, and interdependence, including the concealment email copied to both partners, joint intake calls, joint assurances after the Conflict Letter, repeated identical conflict language in both EAs, coordinated multi-office staffing, and the agency and co-conspirator allegations in the Parties section and the acted-in-concert allegations in Section L.

205. The Defendants' agreement included conducting and participating in the Enterprise's affairs through the scheme and the Predicate Acts, including the initial conflict misrepresentation, the Original EA and Revised EA communications, the concealment instruction, the invoices, the disqualification assurances, the fee estimate, the final demand, and the deposit transfers.

206. As a direct and proximate result of the conspiracy, its overt acts, and the violations of 18 U.S.C. § 1962(d), Plaintiffs suffered the business-or-property losses

alleged above, including the retained deposit, the anti-SLAPP fee award and litigation costs, and the fee-arbitration costs.

**<u>FIRST CAUSE OF ACTION</u>**

**BREACH OF FIDUCIARY DUTY**

**(All Plaintiffs against Defendants Quinn Emanuel Urquhart & Sullivan, LLP, Anthony Alden, and Robert Schwartz)**

207. Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs in this Complaint, above, as if fully set forth and re-alleged here.

208. Ms. Mah, Mahway Inception 1, and Mahway Management retained Quinn Emanuel and attorneys Alden and Schwartz as their legal counsel on or around April 1, 2025. That same day, Alden and Schwartz of Quinn Emanuel started charging Ms. Mah, Mahway Inception 1, and Mahway Management for legal services. The next day, April 2, 2025, other attorneys at Quinn Emanuel started working on behalf of Ms. Mah, Mahway Inception 1, and Mahway Management, including Quinn Emanuel attorney Maria Mortenson. Through late April and early May, Quinn Emanuel, through numerous attorneys working for and on behalf of Quinn Emanuel (including Alden, Schwartz, Mortenson, Casey, Concannon, Machavoine, Marro, Vorburger, Wolfe, Paul Dacier, Danielle Gilmore, Delaney Gold-Diamond, Mauni Jalali, Emily Kapur, Ryan S. Landes, and Scott Schlafer) started representing Ms. Barrica; Mahway Inception 2, LLC; Mahway Inception II Class B Holdings, LLC; Mahway Investment Group, LLC; Mahway Consulting LLC; Mah Family IDF; and Thortus LLC.

209. This retention created a fiduciary relationship between Quinn Emanuel, and its attorneys, Alden, and Schwartz, on the one hand, and Plaintiffs, on the other hand, pursuant to which Quinn Emanuel and its attorneys, Alden, and Schwartz, and each of them, owed duties to Plaintiffs including, but not limited to, the duty to use

reasonable care, the duty of undivided loyalty, the duty of good faith, and the duty to disclose.

210. Quinn Emanuel and its attorneys, Alden, and Schwartz and each of them, breached these duties in numerous ways, including, but not limited to, failing to disclose conflicts of interest related to representing Caldbeck in the sexual harassment and misconduct claims that serve as the basis for the pattern of sexual misconduct at issue in Plaintiffs' complaints against Caldbeck, misrepresenting Quinn Emanuel's prior representation of Caldbeck for their own financial benefit to the tune of nearly $2,000,000 billed to Plaintiffs for work related to Caldbeck, affirmatively hiding the conflicted representation from Caldbeck and the mediator, failing and refusing to provide objective analysis regarding whether Quinn Emanuel would likely be disqualified in matters against Caldbeck related to his history of sexual misconduct, partaking in activities adverse to the interests of Plaintiffs including excessively billing nearly $2,000,000.00 in less than four months despite Plaintiffs' express instructions to keep billing to a minimum.

211. As a proximate result of the breaches of fiduciary duty by Quinn Emanuel and its attorneys, Alden, and Schwartz, and each of them, Plaintiffs have suffered damages in an amount to be proven at trial but at least $514,779.00.

212. Quinn Emanuel, Alden, and Schwartz, and each of them, acted with a deliberate and conscious disregard for Plaintiffs' rights, constituting oppression, fraud, or malice, to justify an award of exemplary and punitive damages.

**<u>SECOND CAUSE OF ACTION</u>**

**(LEGAL MALPRACTICE / PROFESSIONAL NEGLIGENCE)**

**(All Plaintiffs against Defendants Quinn Emanuel Urquhart & Sullivan, LLP, Anthony Alden, and Robert Schwartz)**

213. Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs in this Complaint, above, as if fully set forth and re-alleged

here.

214. Ms. Mah, Mahway Inception 1, and Mahway Management retained Quinn Emanuel and attorneys Alden and Schwartz as their legal counsel on or around April 1, 2025. That same day, Alden and Schwartz of Quinn Emanuel started charging Ms. Mah, Mahway Inception 1, and Mahway Management for legal services. The next day, April 2, 2025, Mortenson, other attorneys at Quinn Emanuel started working on behalf of Ms. Mah, Mahway Inception 1, and Mahway Management. On or before May 19, 2025, Ms. Barrica; Mahway Inception 2, LLC; Mahway Inception II Class B Holdings, LLC; Mahway Investment Group, LLC; Mahway Consulting LLC; Mah Family IDF; and Thortus LLC retained Quinn Emanuel and its attorneys, Alden, and Schwartz as their legal counsel. On or before May 19, 2025, Quinn Emanuel and its attorneys, Alden, Schwartz, and each of them, worked on behalf of Plaintiffs, and each of them.

215. Pursuant to that representation, Quinn Emanuel and its attorneys, Alden, and Schwartz, and each of them, owed Plaintiffs a duty to use such skill and care as a reasonably careful attorney would use in similar circumstances.

216. Quinn Emanuel and its attorneys, Alden, and Schwartz, and each of them, failed to meet this standard of care in numerous ways, including, but not limited to, failing to appreciate allegations in the various complaints would likely elicit anti-SLAPP motions to strike that a reasonably careful attorney would identify and appreciate under similar circumstances, failing to identify conflicts of interest related to representing Caldbeck in the sexual harassment and misconduct claims that serve as the basis for the pattern of sexual misconduct at issue in Plaintiffs' complaints against Caldbeck that a reasonably careful attorney would identify under similar circumstances, failing to engage in or communicate analysis regarding whether Quinn Emanuel would likely be disqualified in matters against Caldbeck related to his history of sexual misconduct that a reasonably careful attorney would

engage in and communicate under similar circumstances, failing to comply with ethical obligations attorneys owe to clients that a reasonably careful attorney would comply with under similar circumstances.

217. As a proximate result of the failures to meet the standard of care by Quinn Emanuel, Alden, and Schwartz, and each of them, Plaintiffs have suffered damages in an amount to be proven at trial but at least $514,779.00.

**THIRD CAUSE OF ACTION**

**RESCISSION**

**(All Plaintiffs Against Defendant Quinn Emanuel Urquhart & Sullivan, LLP)**

218. Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs in this Complaint, above, as if fully set forth and re-alleged here.

219. Plaintiffs and Quinn Emanuel entered into a contract for Quinn Emanuel and its attorneys to represent Plaintiffs; specifically, the Original EA and the Revised EA.

220. The Original EA and the Revised EA are unlawful and thus unenforceable because they are contrary to an express provision of law or contrary to the policy of express law. More particularly, the Original EA and Revised EA are illegal contracts because Quinn Emanuel's representation of Plaintiffs violate the California Rules of Professional Conduct, including but not limited to rules 1.7, 1.9 and 1.10, and thus violate the binding rules governing the ethical practices of law in the State of California that serve as an expression of public policy to protect the public, including Plaintiffs.

221. The consent of Plaintiffs to the Original EA and the Revised EA was given by mistake or obtained through fraud or exercised by or with the connivance of Quinn Emanuel, on its own and acting through Alden, Schwartz, Doolittle, and Olivar, who failed to provide adequate notice of Quinn Emanuel's conflicted

representation and failed to request, let alone obtain informed written consent from Plaintiffs or from Caldbeck for the conflicted representation, and actively hid Quinn Emanuel's representation of Plaintiffs from Caldbeck and the mediator.

222. The consideration provided by Quinn Emanuel, Alden, and Schwartz, and each of them, fails, in whole or in part, through the fault of Quinn Emanuel, Alden, and Schwartz, and each of them, because Quinn Emanuel was conflicted and knew it was conflicted in representing Plaintiffs against Caldbeck, but failed and refused to request, let alone obtain, informed written consent from Plaintiffs or from Caldbeck for this conflicted representation. Indeed, Quinn Emanuel affirmatively tried to hide its representation of Plaintiffs from Caldbeck.

223. The contract is unlawful for causes which do not appear in its terms or conditions, but rather because Quinn Emanuel, Alden, and Schwartz, and each of them, violated their rules governing the ethical practice of law in the State of California.

224. The public interest will be prejudiced by permitting the Original EA or the Revised EA to stand where Quinn Emanuel represented Caldbeck defending against the same sexual assault and sexual harassment claims that make up the pattern of sexual assault and sexual harassment at issue in Plaintiffs' claims against Caldbeck.

225. Plaintiffs are entitled to restitution based on the unilateral rescission of the Original EA and Revised EA and thus are entitled to recover the $200,000.00 advance fee deposit Ms. Mah paid to Quinn Emanuel.

**FOURTH CAUSE OF ACTION**

**COMMON COUNT FOR MONEY HAD AND RECEIVED**

**(Plaintiffs Jessica Mah, Mahway Inception 1, LLC, and Mahway Management, LLC Against Defendant Quinn Emanuel Urquhart & Sullivan, LLP)**

226. Plaintiffs hereby incorporate by reference all allegations contained in the

preceding paragraphs in this Complaint, above, as if fully set forth and re-alleged here.

227. Quinn Emanuel received money that was intended to be used for the benefit of plaintiffs Ms. Mah, Mahway Inception 1, and Mahway Management; specifically, the $200,000.00 Ms. Mah paid to Quinn Emanuel in early 2025 in exchange for Quinn Emanuel acting as attorneys for Ms. Mah, Mahway Inception 1, and Mahway Management.

228. The money was not used for the benefit of Ms. Mah, Mahway Inception 1, and Mahway Management.

229. Quinn Emanuel has not given the money to Ms. Mah, Mahway Inception 1, or Mahway Management. On the contrary, Quinn Emanuel demanded *more* money from Plaintiffs.

230. Ms. Mah, Mahway Inception 1, and Mahway Management are entitled to a return of the $200,000.00 paid to Quinn Emanuel that was meant to be used for the benefit of Ms. Mah, Mahway Inception 1, and Mahway Management.

**FIFTH CAUSE OF ACTION**

**(FRAUD)**

**(All Plaintiffs Against Defendants Quinn Emanuel Urquhart & Sullivan, LLP and Anthony Alden)**

231. Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs in this Complaint, above, as if fully set forth and re-alleged here.

232. On March 30, 2025, Alden, individually and on behalf of Quinn Emanuel, represented in an email to Ms. Mah's agent, Alex Garden, that, "In the interest of full disclosure, two of my NorCal Partners represented Mr. Caldwell [sic] several years ago, but the matter seems to be unrelated and should not pose a problem for this one," regarding Quinn Emanuel possibly representing Ms. Mah in a dispute

with Justin Caldbeck concerning sexual harassment and sexual assault claims. Mr. Garden replied to Alden's email and included Alden's representations with a copy to Ms. Mah. Ms. Mah joined the email chain.

233. On April 1, 2025, Quinn Emanuel, through Alden, represented in writing in the Original EA that, "we have previously represented Mr. Caldbeck but believe the subject of that representation to be unrelated to the subject of the Engagement."

234. Similarly, on May 19, 2025, Quinn Emanuel, through Alden, again represented in writing—this time in the Revised EA—that, "we have previously represented Mr. Caldbeck but believe the subject of that representation to be unrelated to the subject of the Engagement."

235. The March 30, 2025 representation by Alden, individually and on behalf of Quinn Emanuel, that Quinn Emanuel's prior representation of Caldbeck was "unrelated and should not pose a problem for this one" was false. Similarly, the April 1, 2025, and May 19, 2025 representations by Quinn Emanuel, through Alden, that Quinn Emanuel's prior representation of Caldbeck was "unrelated to the subject of the Engagement" was false.

236. Alden and Quinn Emanuel knew the March 30, 2025 representation that Quinn Emanuel's prior representation of Caldbeck was "unrelated and should not pose a problem for this one" was false when made. Indeed, in April 2025, Quinn Emanuel affirmatively tried to hide from Caldbeck that Quinn Emanuel represented Ms. Mah in her dispute against Caldbeck. Similarly, Quinn Emanuel and Alden knew the April 1, 2025, and May 19, 2025 representations that Quinn Emanuel's prior representation of Caldbeck was "unrelated to the subject of the Engagement" were false when made.

237. Alden and Quinn Emanuel made these misrepresentations with the intent to induce Ms. Mah and Plaintiffs to hire Quinn Emanuel to represent them in legal matters against Caldbeck and his co-conspirators related to Caldbeck's sexual assault

and sexual harassment against Ms. Mah and Ms. Barrica and Caldbeck's established pattern of sexual misconduct and the related defamation, extortion, and other misconduct by Caldbeck, Delph, Mulholland, and their co-conspirators.

238. Ms. Mah and Plaintiffs justifiably relied on Alden's and Quinn Emanuel's representations because Alden and Quinn Emanuel made these representations in writing, including in the Original EA and the Revised EA. Ms. Mah and Plaintiffs further justifiably relied on Alden's and Quinn Emanuel's representations because Alden and Quinn Emanuel, but not Plaintiffs, had access to information about Quinn Emanuel's prior representation of Caldbeck. Ms. Mah and Plaintiffs further justifiably relied on Alden's and Quinn Emanuel's representations because Plaintiffs hired Quinn Emanuel and Alden as their attorneys and implicitly trusted them with the expectation that Alden and Quinn Emanuel would act in the best interests of Ms. Mah and Plaintiffs.

239. Ms. Mah and Plaintiffs were harmed as a result of their justifiable reliance on Alden's and Quinn Emanuel's intentional misrepresentations in an amount to be proven at trial, but at least $514,779.00.

240. Quinn Emanuel and Alden, and each of them, acted with a deliberate and conscious disregard for Plaintiffs' rights, constituting oppression, fraud, or malice, to justify an award of exemplary and punitive damages.

## SIXTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

**(All Plaintiffs against Defendants Quinn Emanuel Urquhart & Sullivan, LLP and Anthony Alden)**

241. Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs in this Complaint, above, as if fully set forth and re-alleged here.

242. On March 30, 2025, Alden, individually and on behalf of Quinn

Emanuel, represented in an email to Ms. Mah's agent, Alex Garden, that, "In the interest of full disclosure, two of my NorCal Partners represented Mr. Caldwell [sic] several years ago, but the matter seems to be unrelated and should not pose a problem for this one," regarding Quinn Emanuel possibly representing Ms. Mah in a dispute with Justin Caldbeck concerning sexual harassment and sexual assault claims. Mr. Garden replied to Alden's email and included Alden's representations with a copy to Ms. Mah. Ms. Mah joined the email chain.

243. On April 1, 2025, Quinn Emanuel, through Alden, represented in writing in the Original EA that, "we have previously represented Mr. Caldbeck but believe the subject of that representation to be unrelated to the subject of the Engagement."

244. Similarly, on May 19, 2025, Quinn Emanuel, through Alden, again represented in writing—this time in the Revised EA—that, "we have previously represented Mr. Caldbeck but believe the subject of that representation to be unrelated to the subject of the Engagement."

245. The March 30, 2025 representation by Alden, individually and on behalf of Quinn Emanuel, that Quinn Emanuel's prior representation of Caldbeck was "unrelated and should not pose a problem for this one" was false. Alden, individually and on behalf of Quinn Emanuel, had no reasonable grounds for believing this representation was true when made. Similarly, the April 1, 2025, and May 19, 2025 representations by Quinn Emanuel, through Alden, that Quinn Emanuel's prior representation of Caldbeck was "unrelated to the subject of the Engagement" was false.

246. Alden and Quinn Emanuel lacked reasonable grounds for the March 30, 2025 representation that Quinn Emanuel's prior representation of Caldbeck was "unrelated and should not pose a problem for this one." Quinn Emanuel and Alden lacked reasonable grounds for the April 1, 2025, and May 19, 2025 representations that Quinn Emanuel's prior representation of Caldbeck was "unrelated to the subject

of the Engagement."

247. Alden and Quinn Emanuel made these misrepresentations with the intent to induce Ms. Mah and Plaintiffs to hire Quinn Emanuel to represent them in legal matters against Caldbeck and his co-conspirators related to Caldbeck's sexual assault and sexual harassment against Ms. Mah and Ms. Barrica and Caldbeck's established pattern of sexual misconduct and the related defamation, extortion, and other misconduct by Caldbeck, Delph, Mulholland, and their co-conspirators.

248. Ms. Mah and Plaintiffs justifiably relied on Alden's and Quinn Emanuel's representations because Alden and Quinn Emanuel made these representations in writing, including in the Original EA and the Revised EA. Ms. Mah and Plaintiffs further justifiably relied on Alden's and Quinn Emanuel's representations because Alden and Quinn Emanuel, but not Plaintiffs, had access to information about Quinn Emanuel's prior representation of Caldbeck. Ms. Mah and Plaintiffs further justifiably relied on Alden's and Quinn Emanuel's representations because Plaintiffs hired Quinn Emanuel and Alden as their attorneys and implicitly trusted them with the expectation that Alden and Quinn Emanuel would act in the best interests of Ms. Mah and Plaintiffs.

249. Ms. Mah and Plaintiffs were harmed as a result of their justifiable reliance on Alden's and Quinn Emanuel's misrepresentations in an amount to be proven at trial but at least $514,779.00.

**<u>SEVENTH CAUSE OF ACTION</u>**

**VIOLATIONS OF THE UNFAIR COMPETITION LAW**

**(BUS. & PROF. CODE § 17200 *ET SEQ.*)**

**(All Plaintiffs Against Defendants Quinn Emanuel Urquhart & Sullivan, LLP, Anthony Alden, and Robert Schwartz)**

250. Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs in this Complaint, above, as if fully set forth and re-alleged

here.

251. Plaintiffs are informed and believe, and thereon allege, that defendants Quinn Emanuel, Alden, and Schwartz, and each of them, engage in business acts or practices of representing clients without properly disclosing conflicts with current or former clients and without obtaining written waivers of those conflicts from the affected clients.

252. Plaintiffs are informed and believe, and thereon allege, that defendants Quinn Emanuel, Alden, and Schwartz, and each of them, engage in business acts or practices of misrepresenting to clients their prior or current representation of other clients that caused conflicts with current or former clients.

253. Plaintiffs are informed and believe, and thereon allege, that defendants Quinn Emanuel, Alden, and Schwartz, and each of them, engage in business acts or practices of representing clients in violation of California Rules of Professional Conduct 1.7, 1.9, and 1.10.

254. Plaintiffs suffered an injury as a result of the business practices of Quinn Emanuel, Alden, and Schwartz, and each of them, because, among other things, Plaintiffs paid Quinn Emanuel fees for legal services provided by Quinn Emanuel, Alden, and Schwartz, despite their conflicts and failure to obtain written waivers.

255. Plaintiffs are entitled to restitution for the $200,000.00 they paid to Quinn Emanuel.

256. An injunction should issue precluding Quinn Emanuel, Alden, and Schwartz from engaging in conflicted representation in violation of California Rules of Professional Conduct 1.7, 1.9, and 1.10.

///

///

///

**EIGHTH CAUSE OF ACTION**

**CIVIL RICO – VIOLATIONS OF 18 U.S.C. § 1961 ET SEQ. RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**

**(All Plaintiffs Against Defendants Quinn Emanuel Urquhart & Sullivan, LLP, Anthony Alden, and Robert Schwartz)**

257. Plaintiffs incorporate by reference all allegations in Sections A through M of the General Allegations, above, as if fully set forth and re-alleged here.

258. Quinn Emanuel, Alden, and Schwartz are each a "person" within the meaning of the Racketeer Influenced and Corrupt Organizations Act and are liable under 18 U.S.C. § 1962(c) because each conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise through the pattern of racketeering activity alleged above.

259. The Enterprise is an association-in-fact enterprise as alleged in Sections L and M, above. In the alternative, Quinn Emanuel is a legal-entity enterprise, and Alden and Schwartz are distinct RICO persons who conducted its affairs through the racketeering activity alleged above.

260. The Enterprise engaged in and affected interstate and foreign commerce through interstate communications, multi-state and international staffing, and deposit transfers alleged above.

261. The Predicate Acts subsection of Section M is incorporated by reference and alleges at least fifteen particularized acts of racketeering activity, including mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, and, as to the deposit transfers, transportation or receipt of money taken by fraud under 18 U.S.C. §§ 2314–2315.

262. The Predicate Acts are related and satisfy the continuity requirement because they share the purpose, participants, victims, methods, and results alleged in the pattern of racketeering described above, and together constitute a pattern under 18

U.S.C. § 1961(5).

263. Each Defendant conducted and participated, directly or indirectly, in the conduct of the Enterprise's affairs through that pattern and operated or managed the Enterprise's affairs, as alleged above.

264. Each Defendant's participation involved directing, adopting, or implementing the Enterprise's intake, concealment, staffing, billing, or collection practices, and was not merely the provision of routine legal services.

265. As a direct and proximate result of each Defendant's violation of 18 U.S.C. § 1962(c), Plaintiffs were injured in their business or property in the concrete financial amounts alleged in Section M.

266. The injury is at least $514,779.00, consisting of the $200,000.00 advance fee deposit, the $27,000 fee award against Ms. Barrica, $211,804.00 in anti-SLAPP litigation costs, and $75,975 in fee-arbitration costs.

267. Plaintiffs were the direct and intended targets of the scheme. But for the misrepresentations and concealment, Plaintiffs would have retained other counsel and would not have paid the deposit or continued under the conflicted engagements.

268. The deposit injury resulted from payment in reliance on the misleading conflict representations, the anti-SLAPP losses resulted from complaints filed under the fraudulently obtained engagements, and the fee-arbitration costs resulted from Plaintiffs' response to the fraudulent $1,707,181.96 demand.

269. These losses were not personal-injury damages or remote consequential losses; they were the direct financial consequences of the Enterprise's communications, billing, demand, and deposit-transfer conduct.

270. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages, plus the costs of suit and reasonable attorneys' fees, from Quinn Emanuel, Alden, and Schwartz.

**NINTH CAUSE OF ACTION**

**CONSPIRACY TO COMMIT CIVIL RICO IN VIOLATION OF 18 U.S.C. SECTION 1962(d)**

**(All Plaintiffs Against Defendants Quinn Emanuel Urquhart & Sullivan, LLP, Anthony Alden, Robert Schwartz)**

271. Plaintiffs incorporate by reference all allegations in Sections A through M of the General Allegations, above, as if fully set forth and re-alleged here.

272. Quinn Emanuel, Alden, and Schwartz are each liable under 18 U.S.C. § 1962(d) because each knowingly agreed to conduct and participate in the conduct of the affairs of the Enterprise through the pattern of racketeering activity or agreed to the commission of at least two predicate acts alleged above.

273. Each Defendant was aware of the essential nature and scope of the Enterprise and knowingly adopted its goal of obtaining and retaining fees through concealed conflicts, misleading communications, inflated or unauthorized billing, and collection of money under allegedly invalid engagements. The agreement may be inferred from the coordinated conduct alleged in Section M, including the concealment email, joint intake and assurances, identical EA disclosures, and coordinated staffing.

274. The overt acts in furtherance of the conspiracy include Predicate Acts 1 through 15 alleged in Section M. As a direct and proximate result of the conspiracy, those overt acts, and the violation of 18 U.S.C. § 1962(d), Plaintiffs were injured in their business or property in the amounts alleged in Section M, including the retained deposit, the anti-SLAPP fee award and litigation costs, and the fee-arbitration costs.

275. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages, plus the costs of suit and reasonable attorneys' fees, from Quinn Emanuel, Alden, and Schwartz.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment in their favor and against Defendants, and each of them, as follows:

1. Rescission of the Original EA and of the Revised EA;
2. General and consequential damages in an amount to be determined in accordance with proof at trial, but at least $514,779.00;
3. Special damages in an amount to be proven at trial;
4. Attorneys' fees and costs of suit by contract and by statute;
5. Pre-judgment and post-judgment interest as allowed by law;
6. Exemplary and punitive damages;
7. Treble damages by statute;
8. Restitution;
9. Injunctive relief; and
10. Such other and further relief as the Court may deem as just and proper.

Dated: October 5, 2026

**ENENSTEIN PHAM GLASS GUTENPLAN & BOLLING LLP**

By: ______________________
Matthew W. Rosene
Attorneys for Plaintiffs

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all matters triable by jury.

Dated: October 5, 2026

**ENENSTEIN PHAM GLASS GUTENPLAN & BOLLING LLP**

By: ______________________
Matthew W. Rosene
Attorneys for Plaintiffs